## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| LEGACY SPORTS BARBERSHOP LLC n/k/a LEGACY BRAND ENTERPRISES LLC d/b/a LEGACY SPORTS BARBERSHOP, and LEGACY BARBER ACADEMY, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) |
|  | Civil Action No. 1:20-cv-04149 |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| CONTINENTAL CASUALTY COMPANY, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Legacy Sports Barbershop LLC, n/k/a Legacy Brand Enterprises LLC, d/b/a Legacy Sports Barbershop ("LSB"), and Legacy Barber Academy ("LBA"), individually and on behalf of the other members of the below-defined nationwide classes (collectively, the "Class"), bring this class action against Defendant Continental Casualty Company, and in support thereof state the following:

### I.   NATURE OF THE ACTION

1.   Plaintiff Legacy Sports Barbershop LLC n/k/a Legacy Brand Enterprises LLC, owns and operates Legacy Sports Barbershop & Salon, which is a full service, sports-themed and family-oriented barbershop and salon, located in Virginia Beach, Virginia. Clients have praised LSB for professional standards, tasteful humor, and awesome customer service in a diverse and inviting atmosphere.  LSB endorses standout high school athletes through a variety of promotions. LSB has been serving the Virginia Beach community since 2012; its existence, however, is now threatened by COVID-19.

2.      Plaintiff Legacy Barber Academy prepares students to pass the Virginia State Board Licensing Examination and to enter the barbering profession skilled in client retention, professionalism, customer service, budgeting and team building.  LBA guarantees job placement to students with the skill and work ethic to earn a place behind their own barber chair.  All student haircuts are free.  LBA has been training barbers since 2018; its existence, however, is now threatened by COVID-19.

3.      Due to COVID-19, LSB's and LBA's property has suffered "direct physical loss or damage"—under the plain and ordinary meaning of that term.  Any jury would find that LSB and LBA have suffered a direct physical loss or damage because COVID-19 impaired their property— COVID-19 made the property unusable in a way that it had been used before COVID-19.  There is no need for a court to interpret these five ordinary words, and Illinois law compels that they are given their plain and ordinary meaning, which is exactly what a jury would do if the jury were simply charged with determining whether LSB and LBA have suffered direct physical loss or damage.

4.      Instead of being able to fill the barbershop with clients to get a haircut and compare notes on when pro sports might resume, LSB was forced to close for many weeks, and then was permitted to reopen with 50% occupancy, six feet of physical distancing, and no beard trimming or other services that require removal of a mask.  LBA was unable to bring students in for barbering instruction, and then was permitted to reopen with the same restrictions as the barbershop.  Because to do anything else, would lead to the emergence of coronavirus at LSB and LBA.  Until COVID-19 was brought a bit more under control, even the limited activities upon reopening were not possible.

5.      This loss is "direct"—Plaintiffs are not asking CCC to reimburse them after someone obtained a judgment against the barbershop or school for getting them sick.  That might be an indirect loss.  Plaintiffs are asking CCC to pay for their loss of business income occasioned directly by being unable to use their property.

6. This loss is physical. Plaintiffs are unable to use their interior space in the manner in which they had previously used their interior space. The probability of illness prevents the use of the space in no less of a way than, on a rainy day, a crumbling and open roof from the aftermath of a tornado would make the interior space of a business unusable.[1]

7. This loss is a loss. It is the loss of functionality of the barbershop and school spaces for business purposes. It is the diminishment of the physical spaces in the buildings. What once could hold many now can safely hold only a few.

8. Insurers around the country are now wanting federal and state judges to interpret the words "direct physical loss or damage," but those words need no interpretation. What insurers want is for courts to change the meaning of those terms—instead of just letting a jury apply the facts of the case to these ordinary words and reach a verdict in the same way a jury would reach a verdict if it were called upon to answer whether a person was injured or property was damaged.

9. To protect their businesses in the event that they suddenly had to suspend operations for reasons outside of their control, or if they had to act in order to prevent further property damage, LSB and LBA obtained insurance coverage from Continental Casualty Company ("Continental Casualty" or "CCC"), a wholly-owned subsidiary of CNA Financial Corporation ("CNA"), including special property coverage, as set forth in CCC's Businessowners Special Property Coverage Form (SB146801I), the endorsement for Business Income and Extra Expense (SB146802E) and the endorsement for Civil Authority (SB146826B) (together, the "Special Property Coverage Form").

---

[1] Note, however, that Plaintiffs are not seeking recovery for their loss of use. Plaintiffs are seeking coverage for their loss of business income. Here's an example that drives home the difference, some law firms have been unable to use their office space because of COVID-19, but nevertheless the law firms' business income has increased and they thus have faced no loss of business income. A claim by such a law firm for not being able to use its office space would be a "loss of use" claim. The law firm would have no loss of business income claim. Here, Plaintiffs' businesses have decreased because of the impairment of their business space, and Plaintiffs are seeking the loss of business income under the business interruption coverage of their property insurance policy.

10. CCC's Special Property Coverage Form provides "Business Income" coverage, which promises to pay for loss due to the necessary suspension of operations following loss to property.

11. CCC's Special Property Coverage Form also provides "Civil Authority" coverage, which promises to pay for loss caused by the action of a civil authority that prohibits access to the insured premises.

12. CCC's Special Property Coverage Form also provides "Extra Expense" coverage, which promises to pay the expense incurred to minimize the suspension of business and to continue operations.

13. CCC's Special Property Coverage Form, under a section entitled "Duties in the Event of Loss or Damage" mandates that CCC's insured "must see that the following are done in the event of loss. . . [t]ake all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." This is referred to as "Sue and Labor" coverage.

14. Unlike many policies that provide Business Income coverage (also referred to as "business interruption" coverage), CCC's Special Property Coverage Form does not include, and is not subject to, any exclusion for losses caused by the spread of viruses or communicable diseases.

15. Plaintiffs were forced to suspend or reduce their business due to COVID-19 and the resultant closure orders issued by civil authorities in Virginia.

16. Upon information and belief, CCC has, on a widescale and uniform basis, refused to pay its insureds under its Business Income, Civil Authority, Extra Expense, and Sue and Labor coverages for losses suffered due to COVID-19, any orders by civil authorities that have required the necessary suspension of business, and any efforts to prevent further property damage or to minimize the suspension of business and continue operations. Indeed, CCC has denied Plaintiffs' claim under their CCC policy.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Defendant and at least one member of the Class are citizens of different states and because: (a) the Class consists of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to this claim.

18.    Venue is proper in this District under 28 U.S.C. § 1391, because Defendant resides in this District and a substantial portion of the acts and conduct giving rise to the claims occurred within the District.  Continental Casualty personnel in Chicago, Illinois drafted and sent CCC's denial of coverage to Plaintiff.

## III.    THE PARTIES

### Plaintiffs

19.    Plaintiff Legacy Sports Barbershop LLC, n/k/a Legacy Brand Enterprises LLC, owns and operates Legacy Sports Barbershop & Salon in Virginia Beach, Virginia.  Legacy Sports Barbershop LLC, n/k/a Legacy Brand Enterprises LLC, is a Virginia corporation, with its principal place of business in Virginia Beach, Virginia.

20.    Plaintiff Legacy Barber Academy has its principal place of business in Virginia Beach, Virginia.  Legacy Barber Academy is an Additional Named Insured under the CCC Policy.

21.    Defendant Continental Casualty Company is an insurance company organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

## IV.    FACTUAL BACKGROUND

### A.    The Special Property Coverage Form

22.    In return for the payment of a premium, CCC issued Policy No. 4031549922 to Plaintiffs for a policy period of March 28, 2019 to March 28, 2020, including a Businessowners Special Property Coverage Form.  Policy No. 4031549922 (with Declarations) is attached hereto as Exhibit A.  Plaintiffs have performed all of their obligations under Policy No. 4031549922, including the payment of premiums.  The Covered Property, with respect to the Special Property

Coverage Form, is Plaintiffs' premises at 2720 N Mall Dr. Stop 120, Virginia Beach, Virginia 23454, and 2720 N Mall Dr. Ste. 152, Virginia Beach, Virginia 23454.

23.     In many parts of the world, property insurance is sold on a specific peril basis. Such policies cover a risk of loss if that risk of loss is specifically listed (e.g., hurricane, earthquake, H1N1, etc.). Most property policies sold in the United States, however, including those sold by CCC, are all-risk property damage policies. These types of policies cover all risks of loss except for risks that are expressly and specifically excluded. In the Special Property Coverage Form provided to Plaintiffs, under the heading "Covered Causes of Loss," CCC agreed to "pay for direct physical loss" to Covered Property unless the loss is excluded or limited by the policy.

24.     In the policy, CCC did not exclude or limit coverage for losses from the spread of viruses.

25.     Losses due to COVID-19 are a Covered Cause of Loss under CCC policies with the Special Property Coverage Form.

26.     In the Special Property Coverage Form, CCC agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of their operations during the "period of restoration" caused by direct physical loss or damage. A "partial or complete cessation" of business activities at the Covered Property is a "suspension" under the policy, for which CCC agreed to pay for loss of Business Income during the "period of restoration" that begins within 24 hours after the time of direct physical loss or damage.

27.     "Business Income" means net income (or loss) before tax that Plaintiffs and the other Class members would have earned if no physical loss or damage had occurred, as well as continuing normal operating expenses incurred.

28.     Plaintiffs' and other class members' property have suffered direct physical loss or damage. Due to SARS-CoV-2 or COVID-19, their property has become unsafe for its intended purpose and thus has suffered physical loss or damage. Their property's business functions have been impaired. If they were to conduct business as usual, the disease and virus would show up and people would get sick. This is not a non-physical or remote loss such as one occasioned by a

6

breach of contract, loss of a market, or the imposition of a governmental penalty. It is a direct physical loss. In its current condition, their property is not functional for its business purposes.

29. Moreover, presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006. When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, ISO, circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

30. In the Special Property Coverage Form, CCC also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the Covered Property.

31. "Extra Expense" includes expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

32. CCC also agreed to "pay for the actual loss of Business Income" that Plaintiffs sustain "and reasonable and necessary Extra Expense" that Plaintiffs incur "caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes damage to property other than the Covered Property.

33. CCC's Special Property Coverage Form, under a section entitled "Duties in the Event of Loss or Damage" mandates that CCC's insureds "must see that the following are done in the event of loss. . . [t]ake all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." This is referred to as "Sue and Labor" coverage.

34.     Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities triggered the Business Income, Extra Expense, Civil Authority, and Sue and Labor provisions of the CCC policy. Indeed, many of these orders specifically find that COVID-19 causes property damage.  *See* N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)[2] (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage"); Broward Cty. Fla. Administrator's Emergency Order No. 20-01, at 2 (Mar. 22, 2020)[3] (noting that COVID-19 "constitutes a clear and present threat to the lives, health, welfare, and safety of the people of Broward County"); Harris Cty. Tex. Office of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)[4] (emphasizing that the COVID-19 virus can cause "property loss or damage" due to its contagious nature and transmission through "person-to-person contact, especially in group settings"); Napa Cty. Cal. Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020)[5] (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa County "and the physical damage to property caused by the virus"); City of Key West Fla. State of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020)[6] (COVID-19 is "causing property damage due to its proclivity to attach to surfaces for prolonged periods of time");  City of Oakland Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020)[7] (COVID-19 is "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18, 2020)[8] (stating that the resolution is necessary because of COVID-19's propensity to spread person to person and because the "virus physically is causing property damage"); Exec. Order of the

---

[2] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf
[3] https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf
[4] https://www.taa.org/wp-content/uploads/2020/03/03-24-20-Stay-Home-Work-Safe-Order_Harris-County.pdf
[5] https://www.countyofnapa.org/DocumentCenter/View/16687/3-18-2020-Shelter-at-Home-Order
[6] https://www.cityofkeywest-fl.gov/egov/documents/1584822002_20507.pdf
[7] https://oaklandparkfl.gov/DocumentCenter/View/8408/Local-Public-Emergency-Action-Directive-19-March-2020-PDF
[8] https://www.pcgov.org/AgendaCenter/ViewFile/Item/5711?fileID=16604

Hillsborough Cty. Fla. Emergency Policy Group, at 2 (Mar. 27, 2020)[9] (in addition to COVID-19's creation of a "dangerous physical condition," it also creates "property or business income loss and damage in certain circumstances"); Colorado Dep't of Pub. Health & Env't, Updated Public Health Order No. 20-24, at 1 (Mar. 26, 2020)[10] (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time"); Sixth Supp. to San Francisco Mayoral Proclamation Declaring the Existence of a Local Emergency, 26 (Mar. 27, 2020)[11] ("This order and the previous orders issued during this emergency have all been issued … also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26, 2020)[12] (prohibiting entities that provide food services from allowing food to be eaten at the site where it is provided "due to the virus's propensity to physically impact surfaces and personal property").

B.    *The Covered Cause of Loss*

35.    The presence of COVID-19 on property other than that of Plaintiffs' has caused civil authorities throughout the country to issue orders requiring the suspension of business at a wide range of establishments, including civil authorities with jurisdiction over Plaintiffs' businesses (the "Closure Orders").

1.    **The Virginia Closure Orders**

36.    Effective at 11:59pm on March 24, 2020, the Commonwealth of Virginia issued an Executive Order prohibiting gatherings of 10 or more individuals, and closing a broad range of businesses, including businesses "where personal care or personal grooming services are performed that would not allow compliance with social distancing guidelines to remain six feet apart," including barbershops and barber schools.

---

[9] https://www.hillsboroughcounty.org/library/hillsborough/media-center/documents/administrator/epg/saferathomeorder.pdf
[10] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620
[11] https://sfgov.org/sunshine/sites/default/files/sotf_061020_item3.pdf
[12] https://durhamnc.gov/DocumentCenter/View/30043/City-of-Durham-Mayor-Emergency-Dec-Second-Amdmt-3-25-20_FINAL

37.     Effective on May 15, 2020, the Commonwealth of Virginia issued an Executive Order allowing personal care and personal grooming service establishments such as barbershops to reopen in certain geographic areas, with 50% occupancy, six feet of physical distancing, masks for barbers and clients, and a rigorous cleaning regime (and no services that require removal of a mask).  Certain other businesses were allowed to reopen, subject to restrictions; however, the ban on gatherings of 10 or more individuals remained in effect.

38.     Effective on June 5, 2020, the Commonwealth of Virginia issued an Executive Order for "Phase Two Easing of Certain Temporary Restrictions," which carried forward unchanged the restrictions on Plaintiffs' businesses.

39.     LSB and LBA were required to close, and then were permitted to partially reopen with reduced occupancy, as a result of the Executive Orders (the "Closure Orders").  LSB and LBA partially reopened on or around May 15, 2020.

40.     The Virginia Closure Orders were issued in response to the spread of COVID-19 throughout Virginia.

41.     The presence of COVID-19 caused direct physical loss of or damage to the covered property under Plaintiffs' policy, and the policies of the other Class members, by impairing and damaging the covered property, and by causing a necessary suspension of operations during a period of restoration.

42.     The Closure Orders prohibited access to Plaintiffs' and the other Class members' Covered Property, due to a Covered Cause of Loss.

43.     Violations of the Virginia Closure Orders are enforceable through fine, imprisonment, or both.

**2.     The Impact of COVID-19 and the Closure Orders**

44.     The outbreak and presence of COVID-19 caused direct physical loss of or damage to the Covered Property under Plaintiffs' policy, and the policies of the other Class members, by denying use of and damaging the Covered Property, and by causing a necessary suspension of operations during a period of restoration.

45. The Closure Orders, including the Virginia Closure Orders, prohibited access to Plaintiffs' and the other Class members' Covered Properties, due to a Covered Cause of Loss.

46. As a result of the presence of COVID-19 and the Closure Orders, including the Virginia Closure Orders, Plaintiffs and the other Class members lost Business Income and incurred Extra Expense.

47. LSB submitted a claim for loss to CCC under the Policy due to the presence of COVID-19 and the Closure Orders, and CCC denied that claim. LBA is in the same factual situation as LSB regarding the grounds that CCC set forth as the purported denial of claims under the Policy.

## V.     CLASS ACTION ALLEGATIONS

48. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

49. Plaintiffs seeks to represent nationwide classes defined as:

- All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by CCC; (b) suffered a suspension of business related to COVID-19, at the premises covered by their CCC property insurance policy; (c) made a claim under their property insurance policy issued by CCC; and (d) were denied Business Income coverage by CCC for the suspension of business resulting from the presence or threat of COVID-19 (the "Business Income Breach Class").

- All persons and entities that: (a) had Civil Authority coverage under a property insurance policy issued by CCC; (b) suffered loss of Business Income and/or Extra Expense caused by action of a civil authority; (c) made a claim under their property insurance policy issued by CCC; and (d) were denied Civil Authority coverage by CCC for the loss of Business Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Breach Class").

- All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by CCC; (b) sought to minimize the suspension of business in connection with

COVID-19 at the premises covered by their CCC property insurance policy; (c) made a claim under their property insurance policy issued by CCC; and (d) were denied Extra Expense coverage by CCC despite their efforts to minimize the suspension of business caused by COVID-19 (the "Extra Expense Breach Class").

• All persons and entities that: (a) had a Sue and Labor provision under a property insurance policy issued by CCC; (b) sought to prevent property damage caused by COVID-19 by suspending or reducing business operations, at the premises covered by their CCC property insurance policy; (c) made a claim under their property insurance policy issued by CCC; and (d) were denied Sue and Labor coverage by CCC in connection with the suspension of business caused by COVID-19 (the "Sue and Labor Breach Class").

• All persons and entities with Business Income coverage under a property insurance policy issued by CCC that suffered a suspension of business due to COVID-19 at the premises covered by the business income coverage (the "Business Income Declaratory Judgment Class").

• All persons and entities with Civil Authority coverage under a property insurance policy issued by CCC that suffered loss of Business Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Declaratory Judgment Class").

• All persons and entities with Extra Expense coverage under a property insurance policy issued by CCC that sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their CCC property insurance policy (the "Extra Expense Declaratory Judgment Class").

• All persons and entities with a Sue and Labor provision under a property insurance policy issued by CCC that sought to prevent property damage caused by COVID-19 by suspending or reducing business operations, at the premises covered by their CCC property insurance policy (the "Sue and Labor Declaratory Judgment Class").

50.     Excluded from each defined Class is Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve

the right to modify or amend each of the Class definitions, as appropriate, during the course of this litigation.

51.     This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

52.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).**  The members of each defined Class are so numerous that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are thousands of members of each Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

53.     **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

    a.  Continental Casualty issued all-risk policies to the Class Members in exchange for payment of premiums by the Class Members;

    b.  whether the Class suffered a covered loss based on the common policies issued to members of the Class;

    c.  whether CCC wrongfully denied all claims based on COVID-19;

    d.  whether CCC's Business Income coverage applies to a suspension of business caused by COVID-19;

    e.  whether CCC's Civil Authority coverage applies to a loss of Business Income caused by the orders of state governors requiring the suspension of business as a result of COVID-19;

    f.  whether CCC's Extra Expense coverage applies to efforts to minimize a loss caused by COVID-19;

g. whether CCC's Sue and Labor provision applies to require CCC to pay for efforts to reduce damage caused by COVID-19;

h. whether CCC has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19 and the related closures; and

i. whether Plaintiffs and the Class are entitled to an award of reasonable attorney fees, interest and costs.

54. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class Members' claims because Plaintiffs and the other Class Members are all similarly affected by Defendant's refusal to pay under its Business Income, Civil Authority, Extra Expense, and Sue and Labor coverages. Plaintiffs' claims are based upon the same legal theories as those of the other Class Members. Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.

55. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members who they seeks to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Plaintiffs intend to prosecute this action vigorously. The interests of the above-defined Classes will be fairly and adequately protected by Plaintiffs and their counsel.

56. **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).** Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of Defendant's Business Income, Civil Authority, Extra Expense, and Sue and Labor coverages. The prosecution of separate actions by individual members of the Classes would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendant.

Moreover, the adjudications sought by Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class Members, who are not parties to this action, to protect their interests.

57.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members.

58.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).**   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.     CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT -- BUSINESS INCOME COVERAGE

**(Claim Brought on Behalf of the Business Income Breach Class)**

59.     Plaintiffs LSB and LBA ("Plaintiffs" for the purpose of this claim) repeat and reallege Paragraphs 1-58 as if fully set forth herein.

60.     Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Breach Class.

61.     Plaintiffs' CCC policy, as well as the policies of the other Business Income Breach Class members, are contracts under which CCC was paid premiums in exchange for its promise to pay Plaintiffs' and the other Business Income Breach Class Members' losses for claims covered by the policies.

62. In the Special Property Coverage Form, CCC agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

63. A "partial or complete cessation" of business activities at the Covered Property is a "suspension" under the policy, for which CCC agreed to pay for loss of Business Income during the "period of restoration" that begins within 24 hours after the time of direct physical loss or damage.

64. "Business Income" means net income (or loss) before tax that Plaintiffs and the other Class Members would have earned if no physical loss or damage had occurred, as well as continuing normal operating expenses incurred.

65. COVID-19 caused direct physical loss and damage to Plaintiffs' and the other Business Income Breach Class Members' Covered Properties, requiring suspension of operations at Covered Properties. Losses caused by COVID-19 thus triggered the Business Income provision of Plaintiffs' and the other Business Income Breach Class Members' CCC policies.

66. Plaintiffs and the other Business Income Breach Class Members have complied with all applicable provisions of their policy and/or those provisions have been waived by CCC or CCC is estopped from asserting them, and yet CCC has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

67. By denying coverage for any Business Income losses incurred by Plaintiffs and the other Business Income Breach Class Members in connection with the COVID-19 pandemic, CCC has breached its coverage obligations under the policies.

68. As a result of CCC's breaches of the policies, Plaintiffs and the other Business Income Breach Class Members have sustained substantial damages for which CCC is liable, in an amount to be established at trial.

**COUNT II**
**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of the Civil Authority Breach Class)**

69.  Plaintiffs LSB and LBA ("Plaintiffs" for the purpose of this claim) repeat and reallege Paragraphs 1-58 as if fully set forth herein.

70.  Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Breach Class.

71.  Plaintiffs' CCC insurance policy, as well as the policies of the other Civil Authority Breach Class Members, are contracts under which CCC was paid premiums in exchange for its promise to pay Plaintiffs' and the other Civil Authority Breach Class members' losses for claims covered by the policies.

72.  CCC agreed to "pay for the actual loss of Business Income" that Plaintiffs sustain "and reasonable and necessary Extra Expense" that Plaintiffs incur "caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes damage to property other than the Covered Property.

73.  The Closure Orders triggered the Civil Authority provision under Plaintiffs' and the other members of the Civil Authority Breach Class's CCC insurance policies.

74.  Plaintiffs and the other members of the Civil Authority Breach Class have complied with all applicable provisions of their policies, and/or those provisions have been waived by CCC, or CCC is estopped from asserting them, and yet CCC has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

75.  By denying coverage for any business losses incurred by Plaintiffs and other members of the Civil Authority Breach Class in connection with the Closure Orders and the COVID-19 pandemic, CCC has breached its coverage obligations under the policies.

76.  As a result of CCC's breaches of the policies, Plaintiffs and the other members of the Civil Authority Breach Class have sustained substantial damages for which CCC is liable, in an amount to be established at trial.

## COUNT III
## BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE
### (Claim Brought on Behalf of the Extra Expense Breach Class)

77.     Plaintiffs LSB and LBA ("Plaintiffs" for the purpose of this claim) repeat and reallege Paragraphs 1-58 as if fully set forth herein.

78.     Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Breach Class.

79.     Plaintiffs' CCC insurance policy, as well as the policies of the other Extra Expense Breach Class Members, are contracts under which CCC was paid premiums in exchange for its promise to pay Plaintiffs' and the other Extra Expense Breach Class members' losses for claims covered by the policies.

80.     In the Special Property Coverage Form, CCC also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the Covered Property.

81.     "Extra Expense" includes expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

82.     Due to COVID-19 and the Closure Orders, Plaintiffs and the other members of the Extra Expense Breach Class incurred Extra Expense at Covered Property

83.     Plaintiffs and the other members of the Extra Expense Breach Class have complied with all applicable provisions of their policies and/or those provisions have been waived by CCC or CCC is estopped from asserting them, and yet CCC has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

84.     By denying coverage for any business losses incurred by Plaintiffs and the other members of the Extra Expense Breach Class in connection with the Closure Orders and the COVID-19 pandemic, CCC has breached its coverage obligations under the policies.

85.     As a result of CCC's breaches of the policies, Plaintiffs and the other members of the Extra Expense Breach Class have sustained substantial damages for which CCC is liable, in an amount to be established at trial.

18

**COUNT IV**
**BREACH OF CONTRACT – SUE AND LABOR COVERAGE**
**(Claim Brought on Behalf of the Sue and Labor Breach Class)**

86.     Plaintiffs LSB and LBA ("Plaintiffs" for the purpose of this claim) repeat and reallege Paragraphs 1-58 as if fully set forth herein.

87.     Plaintiffs bring this Count individually and on behalf of the other members of the Sue and Labor Breach Class.

88.     Plaintiffs' CCC policy, as well as the policies of the other Sue and Labor Breach Class Members, are contracts under which CCC was paid premiums in exchange for its promise to pay Plaintiffs' and the other Sue and Labor Breach Class Members' losses for claims covered by the policy.

89.     In the Special Property Coverage Form, CCC agreed to give due consideration in settlement of a claim to expenses incurred in taking all reasonable steps to protect Covered Property from further damage.

90.     In complying with the Closure Orders and otherwise suspending or limiting operations, Plaintiffs and the other members of the Sue and Labor Breach Class incurred expenses in connection with reasonable steps to protect Covered Property.

91.     Plaintiffs and the other members of the Sue and Labor Breach Class have complied with all applicable provisions of their policy and/or those provisions have been waived by CCC, or CCC is estopped from asserting them, and yet CCC has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

92.     By denying coverage for any Sue and Labor expenses incurred by Plaintiffs and the other members of the Sue and Labor Breach Class in connection with the Closure Orders and the COVID-19 pandemic, CCC has breached its coverage obligations under the policies.

93.     As a result of CCC's breaches of the policies, Plaintiffs and the other members of the Sue and Labor Breach Class have sustained substantial damages for which CCC is liable, in an amount to be established at trial.

**COUNT V**
**DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the Business Income Declaratory Judgment Class)**

94.    Plaintiffs LSB and LBA ("Plaintiffs" for the purpose of this claim) repeat and reallege Paragraphs 1-58 as if fully set forth herein.

95.    Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Declaratory Judgment Class.

96.    Plaintiffs' CCC policy, as well as the policies of the other Business Income Declaratory Judgment Class members, are contracts under which CCC was paid premiums in exchange for its promise to pay Plaintiffs' and the other Business Income Declaratory Judgment Class Members' losses for claims covered by the policy.

97.    Plaintiffs and the other Business Income Declaratory Judgment Class Members have complied with all applicable provisions of their policies and/or those provisions have been waived by CCC, or CCC is estopped from asserting them, and yet CCC has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Business Income Declaratory Judgment Class Members are entitled.

98.    CCC has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

99.    An actual case or controversy exists regarding Plaintiffs' and the other Business Income Declaratory Judgment Class Members' rights and CCC's obligations under the policies to reimburse Plaintiffs for the full amount of Business Income losses incurred by Plaintiffs and the other Business Income Declaratory Judgment Class Members in connection with suspension of their businesses stemming from the COVID-19 pandemic.

100.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Business Income Declaratory Judgment Class Members seek a declaratory judgment from this Court declaring the following:

i. Plaintiffs' and the other Business Income Declaratory Judgment Class Members' Business Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

ii. CCC is obligated to pay Plaintiffs and the other Business Income Declaratory Judgment Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT VI**
**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of the Civil Authority Declaratory Judgment Class)**

101. Plaintiffs LSB and LBA ("Plaintiffs" for the purpose of this claim) repeat and reallege Paragraphs 1-58 as if fully set forth herein.

102. Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Declaratory Judgment Class.

103. Plaintiffs' CCC insurance policy, as well as the policies of the other Civil Authority Declaratory Judgment Class Members, are contracts under which CCC was paid premiums in exchange for its promise to pay Plaintiffs' and the other Civil Authority Declaratory Judgment Class Members' losses for claims covered by the policy.

104. Plaintiffs and the other Civil Authority Declaratory Judgment Class Members have complied with all applicable provisions of their policies and/or those provisions have been waived by CCC, or CCC is estopped from asserting them, and yet CCC has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class Members are entitled.

105.    CCC has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

106.    An actual case or controversy exists regarding Plaintiffs' and the other Civil Authority Declaratory Judgment Class Members' rights and CCC's obligations under their policies to reimburse Plaintiffs and the other Civil Authority Declaratory Judgment Class Members for the full amount of covered Civil Authority losses incurred by Plaintiffs and the other Civil Authority Declaratory Judgment Class Members in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

107.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Civil Authority Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

    i.    Plaintiffs' and the other Civil Authority Declaratory Judgment Class Members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

    ii.    CCC is obligated to pay Plaintiffs and the other Civil Authority Declaratory Judgment Class Members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT VII**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the Extra Expense Declaratory Judgment Class)**

108.    Plaintiffs LSB and LBA ("Plaintiffs" for the purpose of this claim) repeat and reallege Paragraphs 1-58 as if fully set forth herein.

109.    Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Declaratory Judgment Class.

110.    Plaintiffs' CCC insurance policy, as well as the policies of the other Extra Expense Declaratory Judgment Class Members, are contracts under which CCC was paid premiums in exchange for its promise to pay Plaintiffs' and the other Extra Expense Declaratory Judgment Class Members' losses for claims covered by the policy.

111.    Plaintiffs and the other Extra Expense Declaratory Judgment Class Members have complied with all applicable provisions of the policies and/or those provisions have been waived by CCC, or CCC is estopped from asserting them, and yet CCC has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class Members are entitled.

112.    CCC has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

113.    An actual case or controversy exists regarding Plaintiffs' and the other Extra Expense Declaratory Judgment Class Members' rights and CCC's obligations under the policies to reimburse Plaintiffs and the other Extra Expense Declaratory Judgment Class Members for the full amount of Extra Expense losses incurred by Plaintiffs in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

114.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Extra Expense Declaratory Judgment Class Members seek a declaratory judgment from this Court declaring the following:

i.    Plaintiffs' and the other Extra Expense Declaratory Judgment Class Members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

ii.    CCC is obligated to pay Plaintiffs and the other Extra Expense Declaratory Judgment Class Members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure

23

Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT VIII
## DECLARATORY JUDGMENT – SUE AND LABOR COVERAGE
### (Claim Brought on Behalf of the Sue and Labor Declaratory Judgment Class)

115.    Plaintiffs LSB and LBA ("Plaintiffs" for the purpose of this claim) repeat and reallege Paragraphs 1-58 as if fully set forth herein.

116.    Plaintiffs bring this Count individually and on behalf of the other members of the Sue and Labor Declaratory Judgment Class.

117.    Plaintiffs' CCC insurance policy, as well as the policies of the other Sue and Labor Declaratory Judgment Class Members, are contracts under which CCC was paid premiums in exchange for its promise to pay Plaintiffs' and the other Sue and Labor Declaratory Judgment Class Members' reasonably incurred expenses to protect Covered Property.

118.    Plaintiffs and the other Sue and Labor Declaratory Judgment Class Members have complied with all applicable provisions of the policies and/or those provisions have been waived by CCC, or CCC is estopped from asserting them, and yet CCC has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

119.    CCC has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

120.    An actual case or controversy exists regarding Plaintiffs' and the other Sue and Labor Declaratory Judgment Class Members' rights and CCC's obligations under the policies to reimburse Plaintiffs and the other Sue and Labor Declaratory Judgment Class Members for the full amount Plaintiffs and the other members of the Sue and Labor Declaratory Judgment Class reasonably incurred to protect Covered Property from further damage by COVID-19.

121.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Sue and Labor Declaratory Judgment Class Members seek a declaratory judgment from this Court declaring the following:

    i.    Plaintiffs' and the other Sue and Labor Declaratory Judgment Class Members reasonably incurred expenses to protect Covered Property from further damage by COVID-19 are insured losses under their policies; and

    ii.    CCC is obligated to pay Plaintiffs and the other Sue and Labor Declaratory Judgment Class Members for the full amount of the expenses they reasonably incurred to protect Covered Property from further damage by COVID-19.

## VII.     <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.     Entering an order certifying the proposed nationwide Classes, as requested herein, designating Plaintiffs as Class representatives, and appointing Plaintiffs' undersigned attorneys as Counsel for the Classes;

b.     Entering judgment on Counts I-IV in favor of Plaintiffs and the other members of the Business Income Breach Class, the Civil Authority Breach Class, the Extra Expense Breach Class, and the Sue and Labor Breach Class; and awarding damages for breach of contract in an amount to be determined at trial;

c.     Entering declaratory judgments on Counts V-VIII in favor of Plaintiffs and the other members of the Business Income Declaratory Judgment Class, the Civil Authority Declaratory Judgment Class, the Extra Expense Declaratory Judgment Class, and the Sue and Labor Declaratory Judgment Class as follows;

    i.    Business Income, Civil Authority, Extra Expense, and Sue and Labor losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

      ii.    CCC is obligated to pay for the full amount of the Business Income, Civil Authority, Extra Expense, and Sue and Labor losses incurred and to be incurred related to COVID-19, the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic;

    d.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

    e.    Ordering Defendant to pay attorneys' fees and costs of suit; and

    f.    Ordering such other and further relief as may be just and proper.

## VIII.   JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: July __14__, 2020

Respectfully submitted,

/s/ Adam J. Levitt

Adam J. Levitt
Amy E. Keller
Daniel R. Ferri
Mark Hamill
Laura E. Reasons
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com
lreasons@dicellolevitt.com

Mark Lanier*
Alex Brown*
Skip McBride*
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
Telephone: 713-659-5200
WML@lanierlawfirm.com

26

alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

Timothy W. Burns*
Jeff J. Bowen*
Jesse J. Bair*
Freya K. Bowen*
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels*
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas 77057
Telephone: 713-917-0024
douglas.daniels@dtlawyers.com

C. Calvin Warriner III*
**SEARCY DENNEY SCAROLA
BARNHART & SHIPLEY, PA**
2139 Palm Beach Lakes Blvd.
West Palm Beach, FL 33409
Telephone: 561-285-4670
CCW@SearcyLaw.com

***Counsel for Plaintiffs
and the Proposed Classes***

*Applications for admission *pro hac vice* to be filed